ON MOTION FOR REHEARING

SAWAYA, J.
A majority of the judges constituting the original panel has decided to grant rehearing in this case. Accordingly, the original opinion rendered in this case is withdrawn and the following opinion is substituted in its place. The Motion for Rehearing En Banc is denied as moot.
We review a final judgment in favor of the Zoning Board of Adjustment of Put *666 nam County (the Zoning Board) and Ronald and Ossie Wilson (the Wilsons) rendered in the declaratory judgment suit filed by Harold Keene challenging the decision of the Zoning Board to grant the Wilsons a special use permit (SUP). The SUP allowed the Wilsons to conduct a horseback riding school on their land and to board and stable horses on their property to compete in a competitive horseback endurance trail ride on nearby property. We must determine whether the trial court erred in upholding the issuance of the SUP.

Factual and Procedural Background

Keene owns property adjoining the Wil-sons’ 11.25-acre tract of land. He is, to put it mildly, a disgruntled and annoyed neighbor of the Wilsons. The facts of the case will explain his state of agitation. Of the horseback riding school for children and the competitive endurance trail runs operated by the Wilsons for financial gain, it is the endurance trail runs that appear to have been the proverbial straw that broke the camel’s back for Keene and other neighbors. Although the endurance runs occur only twice a year, they involve as many as 45 riders and at least that many horses (at times in the past, as many as 60 riders participated), up to 30 additional staff workers, and the arrival and parking of large motor homes pulling horse trailers. A mobile home is used for the judges to sleep in, and each participant is permitted to erect a temporary 12 x 12 foot enclosure to stable and board each horse for the weekend. Bullhorn announcements, loud music, and the need for temporary port-o-lets to accommodate the weekend visitors, who sleep in whatever accommodation they have brought, further aggravated Keene and increased his annoyance at the activities. While the dissent infers that Keene filed suit because of a dog fight between his dogs and dogs owned by the Wilsons, that is speculation at best. Moreover, Keene is not the only disgruntled and annoyed neighbor.
While workers and perhaps some judges arrive during the week, the event participants generally arrive on Friday to prepare for the Saturday departure from the Wilsons’ land to nearby Etoniah Creek State Forest where the trail ride occurs. Entertainment, including hayrides and karaoke, is provided during the evenings. While Mrs. Wilson pleads ignorance to alcohol use, other than beer, by the participants, there was testimony of drunken hayrides. On Sunday, the event concludes and the participants leave. The Wilsons and Keene live on a narrow paved road with no shoulder; a curve, referred to by one witness as “Dead Man’s Curve,” is located between the Wilsons’ driveway and Keene’s driveway and has a 15-mile-per-hour speed limit. Off-duty deputies were hired to handle the traffic issues at the most recent endurance event.
The Putnam County Comprehensive Plan (hereinafter the Plan) designates the Wilsons’ land as Rural Residential Future Land Use. After it was brought to the attention of zoning enforcement authorities that the Wilsons were conducting a riding school and boarding and stabling horses to compete in the endurance trail rides on nearby property, the Wilsons applied for a SUP. The staff report prepared for the Zoning Board classified the riding school and the horse boarding and stabling activities as both “commercial: agriculture-related uses” and as “rural recreational uses” and recommended approval of the SUP. Specifically, the report recommended that the SUP be issued with a cap of 45 riders in the endurance events with a twice per year limit on those events. Approval of the horseback riding school was recommended with a cap of six children at *667 any time. The Zoning Board issued the SUP as recommended.
Keene filed suit for declaratory relief against the Zoning Board, requesting a judgment declaring that the SUP was erroneously granted.[1] As the litigation progressed, the Zoning Board and the Wilsons came to realize that the uses approved in the staff report — “rural recreational” and “commercial: agriculture-related” uses — could not be used on property like the Wilsons’ that is designated Rural Residential. Section A.1.9.3.A.4 of the Plan establishes the classes of uses allowed on property, like the Wilsons’, that is designated “Rural Residential,” and they are: limited agricultural uses; residential; neighborhood commercial; community facilities and services types 1 and 2; and activity-based and resource-based recreational uses. Putnam County, Fla., Comp. Plan § A.I.9.3.A.4. “Commercial: agriculture-related” uses are not listed and thus not allowed, and the Zoning Board candidly admitted that in the trial proceedings. Specifically, the Zoning Board admitted in its answer that the Plan did not allow “rural recreational” or “agriculture-related commercial use” in an area designated as Rural Residential. Despite the analysis in the report, the Zoning Board asserted that the Wilsons’ proposed uses were “Limited Agricultural Uses,” which are permitted in the Rural Residential Future Land Use category. Alternatively, the Zoning Board proposed that the uses could be considered “resource-based recreational” uses that are permitted by the Plan on land designated as Rural Residential. The Wilsons also contended that the uses were actually either limited agricultural, activity-based recreational, or resource-based recreational uses that may be permitted in the Rural Residential category.
Keene argued that even if the uses were labeled as “activity-based recreational” or “resource-based recreational” uses (even *668 though those categories were not identified in the staff report as the basis for its recommendation that the SUP be approved by the Zoning Board), the uses were still wrongly allowed by the Zoning Board. Keene further argued that the uses fell within the category “commercial: agriculture-related,” which is not allowed on land designated as Rural Residential, even by issuance of a SUP.
The case eventually made its way to trial. The trial court concluded that the Wilsons’ uses were “resource-based or activity-based recreational uses” and thus could properly be allowed, by issuance of a SUP, on the Wilsons’ land. The final judgment gives no explanation for this conclusion and makes no findings of fact to support it. Moreover, the trial court made no findings that the proposed uses did not fall within the category of “commercial: agriculture-related” uses and did not make any findings that if it did, which category of use most closely fits the Wilsons’ proposed uses. Therefore, the issue we must resolve is whether the horseback riding school and the boarding and stabling of horses on the Wilsons’ property more closely fall in the category of activity-based or resource-based recreational uses, which are permissible, or whether they more closely fall in the category of “commercial: agriculture-related” uses, which are impermissible even after issuance of a SUP.

Analysis

In order to resolve this issue, we must apply the provisions of the Plan and the Putnam County Development Code (hereinafter the Development Code), which implements the Plan. Chapter 163, Florida Statutes, specifically requires that the “comprehensive plan set general guidelines and principles concerning its purposes and contents ....”§ 163.3194(4)(b), Fla. Stat. (2007) (emphasis added). Therefore, chapter 163 further requires that comprehensive plans be implemented by the “adoption and enforcement” of local regulations or land development codes. § 163.3201, Fla. Stat. (2007) (“It is the intent of this act that the adoption and enforcement by a governing body of regulations for the development of land or the adoption and enforcement by a governing body of a land development code for an area shall be based on, be related to, and be a means of implementation for an adopted comprehensive plan as required by this act.”) (emphasis added); § 163.3202(1), Fla. Stat. (2007) (“[Ejach county ... shall adopt or amend and enforce land development regulations that are consistent with and implement their adopted comprehensive plan.”) (emphasis added); see also Board of County Com’rs of Brevard County v. Snyder, 627 So.2d 469, 473 (Fla.1993) (“The local plan must be implemented through the adoption of land development regulations that are consistent with the plan.”) (citing § 163.3202, Fla. Stat. (1991)). Section 163.3202, Florida Statutes, further provides:
Local land development regulations shall contain specific and detailed provisions necessary or desirable to implement the adopted comprehensive plan and shall as a minimum ... [r]egulate the use of land and water for those land use categories included in the land use element....
§ 163.3202(2)(b), Fla. Stat. (2007) (emphasis added).[2]
Hence, the Development Code was enacted to provide specific legislative standards that must be applied to the general *669 provisions of the Plan and enforced to regulate the various land use categories in the Plan. Specifically, the Development Code provides: “This Land Development Code is enacted pursuant to the requirements and authority of Section 163.3202, Florida Statutes....” Dev. Code § 1.02. The Development Code further provides:
It is the intent of this Code ... to implement the Putnam County Comprehensive Plan. Chapter 163, Florida Statutes, requires each local government to enact a single land development code which implements and is consistent with the local comprehensive plan, and which contains all land development regulations for the County. This Code is consistent with the Putnam County Comprehensive Plan and implements the Plan.
Dev. Code § 1.03.
Included in the Development Code is the standard contained in section 1.06(c), entitled “General Rules of Interpretation,” that requires the “[m]ore specific provisions of this Code shall be followed in lieu of more general provisions that may be more lenient than or in conflict with the more specific provision.” Section 2.02.01(b) of the Development Code further requires that “[w]here a proposed use could be said to fall within more than one category, the Director shall determine in which category the use most closely fits based on the description of the use category and the examples of uses in the category. A proposed use shall be placed in the most specific category in which it fits.” Hence, when a use or activity falls into a category of permissive uses, but more closely falls into a category that is prohibited by the Plan, the latter trumps the former and the activity must be prohibited. This rule is specifically recognized and applied by the courts. See Volusia County v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126 (Fla.2000); Stroemel v. Columbia County, 930 So.2d 742 (Fla. 1st DCA 2006); Saadeh v. Stanton Rowing Found., Inc., 912 So.2d 28 (Fla. 1st DCA 2005); Barry v. Garcia, 573 So.2d 932 (Fla. 3d DCA), review denied, 583 So.2d 1034 (Fla.1991).
Keene argues that the proposed uses of the Wilsons’ property more closely fall into the category of “commercial: agriculture-related” uses, which are prohibited. We agree. The Development Code category labeled “Commercial: Agriculture-Related” specifically and explicitly includes the stabling and boarding of horses and riding academies as examples of uses coming within that category:
a. This category includes commercial uses directly related to agricultural production.
b. Examples:

Stabling or Boarding of Farm Animals

Roadside Stand
Livestock Auction
Feed Store
Saw Mill (where wood is from trees grown on the site of the saw mill)
Slaughterhouse (where animals to be slaughtered are pastured on the site of the slaughterhouse)
Veterinary Facilities: Large Animal

Riding Academy

Airstrip for Crop Dusting
Dev. Code § 2.02.20 (emphasis added).
The record reveals that the only use of the Wilsons’ property in conjunction with the trail rides is to board and stable the horses that participate in that event, which takes place in the nearby Etoniah Creek State Forest. Other than coming and going on the trail rides, the horses are being boarded and stabled on the Wilsons’ land. We also note the testimony of Mrs. Wilson *670 who, when asked whether she had discussed with Putnam County the need for a SUP, testified that when she went in to obtain her occupational license, she informed them “about my possibly boarding horses, and the lessons I gave.... ”
As for the horseback riding school, it clearly falls under the label of “Riding Academy.” The materials filed by the Wilsons in conjunction with their application for the SUP include a Pre-Application for Development Review, which is a draft of their proposed development plan. In it, the Wilsons stated that the type of development was “non-residential” and described the uses as: “Riding Lessons, Competitive Trail Rides, Summer Horsemanship Program.” They further described the non-residential uses as including “horseback riding & horsemanship lessons, summer horsemanship program to teach riding & horsemanship to children, two times yearly competitive trail rides.... ” The Wilsons also filed with the application a flier that provided the summer horsemanship sessions would be held for six weeks and limited to six riders per week. The flier described activities for each weekly session as including “all areas of horsemanship, stable management and health, [and] riding English, Western and bareback.”
These uses are clearly commercial uses. The flier concerning the riding academy provided that the cost would be $135 per week per rider. Therefore, for one week, the Wilsons will collect $810 per week, and for the six-week period, they will collect $4,860. Concerning the boarding and stabling of the horses in connection with the trail rides, the Wilsons submitted a form to be filled out by each individual participant requiring that various fees would be paid, including a $65 entry fee. For 45 riders, the total amount collected would be $2,925 per event. If two events are held each year, the Wilsons will collect a total of $5,850 each year. In total, the Wilsons will generate $10,710 in annual revenue. This is hardly incidental as the Wilsons contend. Moreover, the participants in the trail ride are also required to execute a release and hold harmless agreement to protect the Wilsons’ commercial enterprise from liability. We note that the Wilsons admitted in the proceedings below that the SUP “allow[ed] for the operation of various commercial (paid) equestrian activities. ...”
The dissent argues that use of the Wil-sons’ property as a riding academy or to board and stable horses does not mean that the property is being used for agricultural production. We reject this argument in light of the Development Code provisions defining “commercial: agriculture-related” uses to specifically include riding academies and boarding and stabling horses as examples of activities that directly relate to agricultural production. Dev. Code § 2.02.20. Moreover, section 2.02.01(a) of the Development Code expressly provides that “[a] Use Category defines the types of uses that fit within a given category and then lists examples of the uses that fit the definition.” (Emphasis added). The Development Code further provides that when a use fits more than one category, it shall be determined “in which category the use most closely fits based on the description of the use category and the examples of uses in the category.” Dev. Code § 2.02.01(b) (emphasis added). Hence, it is clear that property used as a riding academy and for the boarding and stabling of horses is property used for agricultural production under the pertinent Development Code provisions. In addition, the staff report issued by the Zoning Board specifically provided “APPLICATION: SUP-06-001 Wilson-Agriculture Based Business.”
*671 We note that in the trial proceedings, the Wilsons admitted and specifically argued that the activities for which they sought the SUP are properly classified as “commercial: agriculture-related” uses. Specifically, their trial memorandum states, “The Wilsons contend that the proposed equestrian activities are closer in nature to commercial agricultural uses, than to the rural recreational uses Keene cites.” The Wilsons then referred to “[t]he examples [which] specifically include ‘Stabling or Boarding of Farm Animals’ and ‘Riding Academy.’ ” They obviously changed their tune when it became apparent that “commercial: agriculture-related” uses are not allowed on property, such as theirs, that is classified as Rural Residential, even with the issuance of a SUP.
Turning now to the use categories the Wilsons contend are appropriate, the Plan defines “Activity-Based Recreational Uses” as “recreational activities providing the participant user with a built court, field or structure for a specific activity or activities. Examples of activity-based uses include, but are not limited to, playgrounds, softball and baseball fields, basketball courts and recreation centers.” Comp. Plan Definitions. Similarly, the Development Code defines “Recreation: Activity-Based” uses:
a. This category includes public recreational uses that primarily rely on facilities sports and other active recreational activities as the attraction.
b. Examples:
Ballparks and fields
Playgrounds
Boat Ramps
Public Docks/Boat Moorings
Putnam County, Fla., Dev. Code § 2.02.22.
Clearly this category of use requires a facility, such as a court, field, or structure affixed on the property, designed to be used for sports and recreation. There is absolutely no evidence in this record to show that there is anything resembling such a facility on the Wilsons’ property. It is an 11.25-acre tract of land that is not designed for or intended to be used for anything remotely similar to a playground, softball or baseball field, basketball court, recreation center, boat ramp, or public mooring. Michelle Kennedy, who served on the staff of Putnam County Planning and Development Services and who prepared the staff report for the Zoning Board, testified that she inspected the Wil-sons’ property and had seen “fields, trees, the Applicant’s home, and the barn.”
Although the Comprehensive Plan does not define resource-based recreational activities, the Development Code’s category of “Recreation: Resource-Based” defines this use:
a. This category includes public recreational uses that primarily rely on natural resources as the attraction.
b. Examples:
Public and Private Parks
Public and Semi-Private Beaches
Dev. Code § 2.02.21. There is no natural resource that is the basis of the' attraction to the Wilsons’ property remotely resembling a beach or park. It is nothing more than an 11-plus acre tract of property with a house and barn. Like the prior use category, it is difficult to see how the Wilsons’ use of their property falls into this use category.[3]
*672 The dissent actually contends that the natural resource the Wilsons are relying on is “horseback riding in a rural setting.” That is certainly not a natural resource recognized in the Plan and the Development Code. If that were the case, then all a person would need to qualify for a SUP under the resource-based and recreational-based category is a rural piece of property, a horse and saddle, and a horseback ride. This argument defies logic and common sense, and we totally reject it.
The dissent then argues that that the Wilsons’ proposed uses are in the nature of a fish camp, a marina, or some sort of campground, which are allowed under section A.1.9.3.A.4(f) of the Plan. We disagree. The only part of section (f) that applies to this case is the provision that “[ajctivity-based and resource-based recreational uses are permitted subject to compliance with standards provided in the land development code.” Putnam County, Fla., Comp. Plan § A.1.9.3.A.4(f). The remainder of section (f) applies to “further” regulation of marinas, fish camps, and campgrounds to allow limitations of their scale “in the development review process”; requires that marinas and fish camps be adjacent to specifically named lakes and rivers; and requires that the density of any marina, fish camp, or campground not exceed “12 units or spaces per acre.” Putnam County, Fla., Comp Plan § A.1.9.3.A,.4(f). There is absolutely no evidence that the Wilsons’ property can be used as a campground because it is not divided into units or spaces for that purpose and it cannot be used as a marina or fish camp because the property is not adjacent to any lake or river. Furthermore, to qualify for use as a campground, the property must encompass 20 acres or more; contain clearly defined campsites that abut on a street with each campsite containing a minimum of 1,500 square feet and a width of 30 feet; provide electrical outlets for the RV vehicles that park on the Wilsons’ property; supply water to each campsite by piping and a cold water tap; contain the required sanitation facilities such as showers and restroom facilities; and provide a central sanitary sewer system. Dev. Code § 3.02.36. The Wilsons’ property meets none of these requirements: it is nothing more than 11.25 acres with trees, fields, a house, and a barn.
Moreover, the dissent fails to mention that the Zoning Board only alternatively proposed that the uses may be categorized as resource-based recreational uses. More importantly, the Wilsons did not apply for a SUP based on intended uses of their property that are remotely similar to a fish camp, campground, or marina; the application for the SUP was never analyzed by the Zoning Board for approval based on use of the property as a fish camp, campground, or marina; a staff report was never issued for use of the property as a fish camp, campground, or marina; and a SUP was never issued authorizing the property to be used for those purposes. The testimony of Mrs. Kennedy explains why the Wilsons applied for a SUP and how they intended to use their property:
Q. So if I understand correctly, the Wilsons needed a Special Use Permit because the things they wanted to do were one or more of the things on that list you just read; correct?
A. Yes.
Q. And which things were those?
A. The riding academy and the endurance rides.
Q. Would the endurance rides fit under stabling or boarding of farm animals, was that the relationship there?
A. It would be — the endurance rides are — it’s a temporary storing of those animals while they are not riding.
*673 Q. The part of the — the part of the endurance rides that actually takes place on the Wilson property is, in fact, a temporary stabling or boarding of those horses; is it not?
A. Yes.
Q. Okay. So again, that is why the Wilsons had to apply for the Special Use Permit?
A. Yes.
[[Image here]]
Q. So just to be clear, in your opinion, then, and what you put in your Staff Report both the competitive trail endurance rides, and the Summer horse camp riding academy were and are Commercial Agricultural-related uses; right?
A. Yes.
It is clear that the Wilsons applied for a SUP to allow the riders in the trail event to board and stable their horses in preparation for the trail ride on nearby property and to allow the riding students to participate in the week-long riding academy. The trail riders and students do not go there to fish, launch boats, or to recreate in a campground.
We conclude that the activities conducted on the Wilsons’ property fit much more closely and specifically into the prohibited “commercial: agriculture-related” use category than into the activity-based or resource-based recreational use categories. This is not even a close call.
Finally, we agree with the dissent that this case will not rivet the attention of many. It is a unique case that is dependent upon application of obscure statutes contained in Putnam County’s Comprehensive Plan and Development Code, and it will be of little interest or significance to anyone other than the parties who have participated in it. But that does not mean that we should be any less thorough in our review of this case or curtail legitimate criticism of the many erroneous assertions we see in the dissent.

Conclusion

To summarize what happened here, after the Wilsons applied for a SUP to conduct the riding academy and horse boarding and stabling activity on their property, the Zoning Board analyzed the staff report that properly placed those activities into the “commercial: agriculture-related” category and erroneously issued the SUP in violation of the provisions of the Plan and the Development Code that clearly prohibit such uses on property designated as Rural Residential. The Zoning Board realized the error after the suit was filed by Keene and proposed the alternative use categories of activity-based or resource-based recreational uses. Unfortunately, the trial court misapplied the law and incorrectly interpreted the pertinent portions of the Plan and the Development Code by failing to apply the rule that the proposed uses must be placed in the use category into which they most closely fit. We believe it is time to correct these errors. We do so by holding that issuance of the SUP ran afoul of the Plan and the Development Code, and the trial court erred as a matter of law in upholding it. Accordingly, the final judgment is reversed and the cause remanded with instructions to enter a declaratory judgment finding the SUP was improperly issued.
REVERSED and REMANDED with instructions.
PLEUS, JR., R., Senior Judge, concurs.
GRIFFIN, J., dissents, with opinion.

. The dissent questions whether the SUP issued to the Wilsons is a development order under section 163.3215. This is not an issue raised by the parties in the instant proceedings. Even the Wilsons admitted in the trial proceedings that “the permit purports to be a development order...." Nevertheless, the SUP issued in this case is clearly a development order. Section 163.3164(7), Florida Statutes, specifically defines "development order" as "any order granting, denying, or granting with conditions an application for a development permit.” Section 163.3164(8) defines "development permit" as an official action having the effect of permitting the development. Section 163.3215(6) defines “development" as having the meaning in section 380.04, Florida Statutes, which defines “development” as "making any material change in the use or appearance of any structure or land....” The Zoning Board admitted in the trial proceedings that the SUP was issued as a development order and the record reveals that the Wilsons applied for a development permit. They filed a Pre-Application for Development Review that specifically states:
Prior to filing for development plan review for Class II or Class III development projects, the owner or developer must submit a draft version of the plan of development for review by the Development Review Committee (DRC).... The purpose of the pre-application conference is for the owner or developer to introduce and describe the proposed development project. ...
The application for development further requested that the owner or developer provide a "Project Description: (Please provide a conceptual site plan showing proposed improvements on the site....)." The proposed uses and improvements the Wilsons included in their response stated that the project would be used to give riding and horsemanship lessons and trail rides twice yearly, that a mobile home would be used for restroom and kitchen facilities, and that additional handicapped facilities would be provided for the events. The Wilsons applied for a development permit for their proposed development project and received a development order.

. The land use element is a specific part of a comprehensive plan. See § 163.3177, Fla. Stat. (2007).

. The dissent states that the trail rides were permitted by the Florida Division of Forestry and sponsored by the South Eastern Distance Riders Association. These facts have absolutely nothing to do with whether the Wilsons were legally using their property to board and stable the horses that participate in the riding event that takes place on nearby property.